UNITED STATES of America, Plaintiff–Appellee,

v.

Warren Eugene WAKE, Defendant–Appellant.

No. 90–8388.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1991.

---

Russell Ramirez, (court-appointed), Ray N. Donley, Scott, Douglas & Luton, Austin, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before REYNALDO G. GARZA, WIENER, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge.

Warren Eugene Wake appeals his conviction, including for possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). The principal issue is the application of the "schoolyard statute", 21 U.S.C. § 845a, which enhances the penalty, found in § 841(b), for, *inter alia*, possession with intent to distribute within 1,000 feet of a school.[1] Wake contests the jury being allowed to find it applicable, without being required to concomitantly find that he distributed within that 1,000–foot zone. At issue is whether the statute is applicable if, within the zone, Wake possessed with intent to distribute somewhere, including outside the zone. We AFFIRM.

---

1. Section 845a has been recodified at 21 U.S.C. § 860. Pub.L. 101–647, enacted November 29, 1990.

I.

On August 14, 1989, police for Austin, Texas, arrested Mitch Hall and Johnetta Norris for possession of, and seized, marijuana. After his arrest, Hall indicated a willingness to cooperate with the police. When questioned by them, Hall admitted that he owned all the marijuana seized and signed a confession. He named Wake as a marijuana supplier.

Hall discussed with the police whether Norris, his girlfriend, would be prosecuted. According to Hall's testimony at trial, the police told him on the evening of his arrest that they would not press charges against Norris if he made a statement and cooperated. However, Officer Staha, at the earlier suppression hearing, denied threatening Hall with prosecution of Norris. Staha testified he told Hall that, because Hall owned all the marijuana and Norris owned none, Norris would not be prosecuted. Norris was released and never indicted.

Having identified Wake as a marijuana supplier, Hall agreed with Staha and DEA Agent Hildreth to make a recorded telephone call to him. Hall called Wake's pager number, and Wake responded by telephone. Hall asked to purchase cocaine from Wake, and Wake directed him to contact Michael Segura. Segura answered Hall's pager call, and the two men arranged for Hall to purchase an ounce of cocaine that evening at a specified time and place. Agents recorded the telephone conversations.

The agents arrested Segura when he arrived at the agreed location for the transaction and seized cocaine, a pager, and tally sheets from him. And, Segura admitted that the cocaine he was carrying belonged to Wake. He explained at trial that he distributed cocaine regularly for Wake between June and August in 1989. Normally, Wake would weigh out cocaine during the day and leave it for Segura to distribute at night. At the end of the evening,

Segura routinely left money, tally sheets, and leftover cocaine at Wake's office.

Law enforcement officers obtained search warrants for Wake's residences and safe deposit box. They arrested him at his home on August 24, 1989, and seized cash, tally sheets, digital pagers and a key ring containing two safety deposit box keys.

The next day, Sheri Austin, the manager of the building where Wake rented an office, telephoned police officer Mark Thompson. Austin had seen a television report on Wake the night before and informed Thompson that Wake rented an office in her building. She had not given Thompson information on any previous occasion. Based on the information Austin furnished, Hildreth obtained, from a United States Magistrate Judge, a search warrant for Wake's office. However, when officers arrived at the building, they discovered that the suite whose number Austin had given them was subdivided into three smaller suites. Hildreth returned the original warrant unexecuted and obtained a more specific warrant. The search of the office uncovered various drug paraphernalia, drug records, marijuana, and approximately two kilograms of cocaine. Moreover, Wake's office was located within 400 feet of Travis High School, a public secondary school in Austin.

A second superseding indictment charged Wake with: (1), within 1,000 feet of a school, conspiring to possess with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 845a(a) (count 1); (2), within 1,000 feet of a school, possessing with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) (count 2); (3) possessing with intent to distribute more than five kilo-grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) (count 3); and (4) money laundering, in contravention of 18 U.S.C. § 1956(a)(1)(A)(i) (count 4). Wake's pre-trial motions to suppress the Hall telephone conversations and evidence seized from his office were denied. He was found guilty by a jury on all counts. And, his post-trial motions, including for a new trial based on newly discovered evidence, were denied. The district court sentenced Wake to 327 months' imprisonment, eight years of supervised release, a $160,000 fine, and a $200 special assessment.[2]

## II.

Wake contends that the district court committed reversible error by (1) admitting into evidence (a) the telephone conversations allegedly obtained in violation of statute, (b) evidence seized pursuant to a warrant supported by an affidavit containing incorrect statements, and (c) documents he contends were unauthenticated and hearsay; (2) its application of the schoolyard statute (penalty enhancement); and (3) refusing to grant a new trial based on newly discovered evidence. He also contends that an answer by a government witness, asserted to be in violation of an agreed motion in limine, mandates reversal.

## A.

Wake asserts that the telephone conversations recorded through Mitch Hall's cooperation should have been suppressed, asserting that Hall's consent was coerced. Wake maintains that the district court committed reversible error in denying his motion to suppress, including because it did so without hearing Hall's testimony on this issue.[3] "We review a district court's find-

---

**2.** The sentences for the four counts run concurrently. Among other things, Wake received 327 months' imprisonment for each of counts 1–3; 240 months for count 4.

**3.** Wake's motion to suppress was denied after a hearing in February 1990, at which, contrary to a motion by Wake, Hall (then in state custody) was not produced to testify. At the hearing, the district court stated that "if it is apparent to the court that Mr. Hall's presence is necessary for the court to rule on either or both of these motions, the court would take the motion under advisement and ... give you another opportunity to present Mr. Hall physically here." Following the second superseding indictment (on which Wake was tried), Wake filed the same motion to suppress. It was denied at the start of trial in June 1990. Wake's counsel did not seek to present testimony or argument at that time, stating instead that it was "essentially the same motion [as the first].... We would just

ings of fact on a motion to suppress under the clearly erroneous standard". *United States v. Colin*, 928 F.2d 676, 677 (5th Cir.1991).

■ Wake relies on 18 U.S.C. § 2515, which prohibits illegally intercepted communications being used as evidence. The government relies on an exception for instances where: "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c). The government bears the burden of proving voluntariness. *United States v. Jones*, 839 F.2d 1041, 1050 (5th Cir.), *cert. denied*, 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988). However, "[c]onsent to interception of a telephone call may be inferred from knowledge that the call is being monitored." *United States v. Gomez*, 900 F.2d 43, 44 (5th Cir.1990); *see Jones*, 839 F.2d at 1050; *United States v. Kolodziej*, 706 F.2d 590, 593 (5th Cir.1983). This notwithstanding, Wake maintains that special circumstances warrant a finding of involuntariness, even though Hall was aware the telephone conversations were being monitored. In support, Wake asserts that his cooperation in exchange for not prosecuting Norris was improperly obtained, because there was no realistic basis for prosecuting Norris, in that Hall owned all the marijuana that was seized. This point was argued to the district court at the suppression hearing.

And, at that hearing, the district court heard testimony on whether agents induced Hall's cooperation by promising not to prosecute Norris. Officer Staha testified that he did not threaten to prosecute Norris if Hall failed to cooperate; that Hall completed a written confession and then raised the issue of Norris' not being prosecuted; and that Staha agreed she would not be. Agent Hildreth testified that he

was present when agents interviewed Hall and that he knew nothing of any such promises. He suggested that Hall acted out of self-interest: "It was obvious to me by my interview with Mr. Hall that he intended to help himself, that he [was] resigned to the fact that he was guilty of the crime and was trying to help himself."

After hearing testimony at the suppression hearing, the district court, in denying the motion, ruled orally that Hall's testimony was not necessary, because even if the alleged threats about prosecuting Norris had been made, this would not be sufficient to grant the motion. In its subsequent comprehensive written order, the district court held:

> The Court finds that the government has met its burden of showing that the informant consented voluntarily to the recorded telephone conversations at issue in this case. The Court is persuaded by the testimony offered at the hearing that Mitch Hall consented to the telephone conversation in order to help himself by cooperating. There is no evidence that this consent was obtained by threats or promises of improper action of a physical nature or of prosecutorial actions with no realistic foundation. *Kolodziej*, 706 F.2d at 595.

■ Even if consideration of Hall's testimony before ruling on the motion to suppress would have furthered the fact-finding process, *see* note 3, *supra*, the district court's failure to do so is not reversible error. In reviewing a district court's ruling on a motion to suppress, our "task on appeal is limited to determining whether there is sufficient evidence to support the district court's conclusion...." *Kolodziej*, 706 F.2d at 593. There is ample evidence

---

urge it for this superseding indictment." However, after the tapes of the conversations were heard by the jury, Wake's counsel did elicit testimony from Hall concerning the arrest of him and his girlfriend, Norris, including: why he agreed to assist the police ("They told me they wouldn't press charges on her ... if I made a statement and cooperated."); and that although Norris was present with the marijuana when arrested, it all belonged to him. When

Wake then sought to make a proffer on Hall's lack of consent, the district court refused the request, noting that Hall had just testified on some aspects of it, that it had previously ruled on the issue, and that the issue was accordingly preserved for appeal. Wake did not then renew his motion to suppress or seek other relief. Accordingly, in ruling on this issue, we do not consider Hall's trial testimony. But, even if we could, it would not alter our holding.

of voluntariness to which the district court could give credence.

■ Staha's testimony supported the conclusion that no coercion occurred. Further, Hildreth's testimony furnished evidence that Hall cooperated out of a desire for leniency for himself; "[r]aised expectations and hopes for leniency do not amount to coercion." *United States v. Llinas,* 603 F.2d 506, 508 (5th Cir.1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980). And, as noted by the district court, although "consent may be invalid ... if ... secured by threats of 'prosecutorial action which had no realistic foundation,'" *Jones,* 839 F.2d at 1051 (quoting *Kolodziej,* 706 F.2d at 595 (quoting *United States v. Horton,* 601 F.2d 319, 323 (7th Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979))), we conclude that the district court's factual finding that no such threats occurred is not clearly erroneous. The district court's finding the evidence admissible was not error.

### B.

Wake maintains that the evidence seized pursuant to the second search warrant was inadmissible, because Agent Hildreth misrepresented facts in the affidavit he submitted to support issuance of the warrant. He asserts that this falsehood did not become known until trial, when Thompson testified during Wake's case-in-chief. Wake does not state how, or when, he sought relief upon becoming aware of this alleged falsehood. He simply contends that it is the basis for reversible error.

■ At the conclusion of the proof, Wake moved unsuccessfully for acquittal, based on Thompson's testimony. And, in part, he sought a new trial based on this as well, which the district court denied. Prior to trial, Wake twice moved unsuccessfully to suppress the evidence; but the motions were not premised upon the alleged falsehood.[4] Accordingly, because Wake raised his argument only in motions for acquittal and a new trial, the scope of our review is quite limited. *See United States v. Raborn,* 872 F.2d 589, 594 (5th Cir.1989) ("The standard of review on a motion for judgment of acquittal is whether 'viewing the evidence and the inferences therefrom in the light most favorable to the government, a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.'" (quoting *United States v. Trevino,* 720 F.2d 395, 398 (5th Cir.1983))); *United States v. Vergara,* 714 F.2d 21, 23 (5th Cir.1983) (district court's denial of a new trial reversible only where so clearly erroneous as to constitute an abuse of discretion).

The affidavit relied on the statement Sheri Austin gave to Mark Thompson of the Austin Police. As discussed, Austin called Thompson and told him that Wake rented an office on property she managed; but, contrary to a statement in the affidavit, she had not furnished him information on previous occasions.[5] As noted, Thomp-

---

4. As with the motions to suppress the telephone conversations, *see* note 3, Wake moved to suppress before and after the second superseding indictment. In each instance, he asserted in general that probable cause to justify the warrant was lacking. At the earlier described February 1990 suppression hearing, *see* note 3, the first of the two motions was argued. It was for the most part, if not totally, premised upon the telephone conversations also sought to be suppressed. In its earlier referenced February 1990 comprehensive written order denying the motions, the district court stated that an evidentiary hearing had not been required concerning the search warrant, because Wake had not alleged (as he did at the end of and after trial) that false information in the affidavit was necessary for finding probable cause for issuance of the warrant; and that therefore, the scope of its review was the sufficiency *vel non* of the sup-

porting affidavit on its face, citing *Illinois v. Gates,* 462 U.S. 213, 237–38, 103 S.Ct. 2317, 2331–32, 76 L.Ed.2d 527 (1983) and *Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978). The second (post second superseding indictment) motion was presented and denied on the first day of trial without argument. Wake's counsel stated that he filed it because he "just wanted to make sure that we preserve our objection on the superseding indictment."

5. The affidavit supporting the first warrant, executed at 12:55 p.m. on August 25, 1989, stated in relevant part:

   16. On 8/25/89, Officer Mark Thompson of the Austin Police Department, Repeat Offender Program, received information from a confidential and reliable informant who has giv-

son testified at trial as to the inaccuracy of this statement in Hildreth's affidavit.

As also noted, the first warrant was returned unexecuted because it did not specify the exact number of the suite to be searched. The United States Magistrate Judge authorized issuance of a second; the affidavit supporting it explained that the building manager had confirmed the informant's statements and furnished the precise location of Wake's office.[6]

■ In evaluating the sufficiency of an affidavit forming the basis for issuance of a search warrant, our inquiry is "whether the magistrate was provided with sufficient reliable information from which he could reasonably conclude that the items sought in the warrant were probably at the location sought to be searched." *United States v. Morris*, 647 F.2d 568, 573 (5th Cir. Unit B 1981). In making a probable cause determination, the magistrate "may draw reasonable inferences from the material he receives, and his ultimate probable cause decision should be paid great deference by reviewing courts." *United States v. May*, 819 F.2d 531, 535 (5th Cir.1987). The magistrate's task

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supply-

ing hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (citation omitted).

■ On its face, the affidavit provided a sufficient basis to find the requisite probable cause.[7] But, as noted, Wake claims that the evidence seized from his office should be suppressed, because Agent Hildreth furnished false statements in that affidavit. In the earlier referenced *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court considered the defendant's burden in challenging the truthfulness of factual statements made in an affidavit supporting a warrant. In outlining the circumstances under which the defendant would be entitled to a hearing, the Court held:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth.... Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant....

---

en Officer Thompson credible and reliable information on previous occasions and known to Officer Thompson as having no previous arrest record that Warren WAKE rents a business located at Suite # 204 at the office complex located at Summit Point # 2, 2512 South IH–35, Austin, Texas.... In August of 1989, your affiant, along with Officer Staha, received information from a confidential and reliable informant who has given your affiant credible and reliable information on at least four occasions within the last three months that Warren WAKE maintains a storage facility outside of his residence in which to conceal quantities of controlled substances.

**6.** In the affidavit supporting the second warrant, issued later the same day, the following paragraph was included:

> 17. On August 25, 1989, Magistrate Stephen H. Capelle signed a warrant authorizing a search of Summit Point II, 2512 South IH 35, Austin, Texas, Suite 204. Your affiant and

other police officers attempted to execute the warrant at suite 204. Your affiant discovered that suite 204 is subdivided into several offices, some occupied and some vacant. Upon further inquiry, the credible and reliable informant referred to in paragraph 16 above told Officer Mark Thompson that the room rented by Warren WAKE within suite 204 is located 2 doors east of the room leased to Romero–Garza Insurance Co. The building manager has positively identified that room as suite 204C. *Further, the building manager confirmed that suite 204C is leased to Warren WAKE.*

The italicized portions were handwritten and initialed by the affiant. Paragraph 16 of the affidavit, *see* note 5, was substantially the same in the second affidavit, except for the identification of Wake's suite as suite 204C. (Emphasis added.)

**7.** It is not clear whether Wake raises the facial sufficiency of the affidavit as an issue. Assuming that he does, it totally fails.

438 U.S. at 171, 98 S.Ct. at 2684. Therefore, the person whose deliberate falsehood or reckless disregard for the truth is at issue is Hildreth, the affiant, and not Thompson. Under *Franks*, if Wake had succeeded in making such a showing to the district court with respect to Hildreth, its next task would have been to consider whether "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause...." 438 U.S. at 171–72, 98 S.Ct. at 2684. *Franks* decided that the Fourth Amendment does not require suppression of evidence whenever the warrant authorizing the seizure is supported by any inaccurate or false statements. Rather, the fruits of the search are admissible so long as there is no showing of deliberate falsity or reckless disregard of the truth in the affidavit; or, where there is such a showing, so long as the affidavit, when stripped of its false or inaccurate statements, supports a finding of probable cause.

█ Wake did not prove that Hildreth acted with deliberate falsehood or reckless disregard for the truth. Although Wake elicited testimony from Thompson—belatedly at trial—that Austin had not furnished prior reliable information, he did not adduce, or otherwise present, any proof that Hildreth submitted the affidavit knowing of the false statements or with reckless disregard for their truth. Because we find insufficient evidence of deliberate falsehood or reckless disregard for the truth, we need not consider whether probable cause would exist if the inaccurate statements were excised. There was no error, especially under the narrow standard of review for motions for acquittal and new trial.

### C.

Wake contests use of the penalty enhancement provided by the schoolyard statute for

[a]ny person who violates section 841(a)(1) or section 856 of this title by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school....

21 U.S.C. § 845a(a). Section 841(a)(1), the substantive offense, one of the statutes whose penalty is enhanced by the schoolyard statute, provides:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) To manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance....

Penalties for violation of § 841(a) are found in § 841(b). And, if the elements of the schoolyard statute are found, a defendant is subject to greater punishment than provided under § 841(b), including multiples of some of the penalties.

Wake was indicted under the "possessing with intent to distribute" clause of the schoolyard statute. He does not dispute that he possessed cocaine within 1,000 feet of a school or that he intended to distribute it somewhere. Rather, he asserts that, for the schoolyard statute to apply, he must have intended to distribute the controlled substance within 1,000 feet of a school. The district court did not present the jury with the option of finding that Wake's transfer—within the prohibited zone—of possession of the cocaine to Segura each evening constituted distribution within the meaning of the statute. Pursuant to the instructions given, and in order to find Wake guilty, the jury had to find not that he intended to distribute the drugs within 1,000 feet of a school, but only that he intended to distribute them (*somewhere*).[8]

---

**8.** The district court instructed the jury as follows:

As to Counts 1 and 2 of the superseding indictment, in order to establish the offense proscribed by that [schoolyard] statute, the government must prove each of the following elements beyond a reasonable doubt:

First, that the defendant knowingly and intentionally possessed more than five hundred

Accordingly, we must decide whether the statute supports the instruction. *Cf. United States v. Rogers,* 918 F.2d 207, 214 (D.C.Cir.1990) (declining to address issue of which construction of schoolyard statute is correct because ample evidence existed of defendant's intent to distribute within 1,000 feet of a school). The issue is whether the jury could convict Wake under § 845a (now 21 U.S.C. § 860) if it found that he possessed a controlled substance within 1,000 feet of a school with intent to distribute it somewhere.

■ Neither this nor any other court of appeals has ruled on this issue. However, at least three district courts have. Each has given the statute the interpretation that Wake advocates. *See United States v. McDonald,* 777 F.Supp. 44, 45–46 (D.D.C.1991); *United States v. Testa,* 768 F.Supp. 221, 223 (N.D.Ill.1991); *United States v. Liranzo,* 729 F.Supp. 1012, 1014 (S.D.N.Y.1990); *United States v. Coates,* 739 F.Supp. 146, 153 (S.D.N.Y.1990); *United States v. Roberts,* 735 F.Supp. 537, 540–41 (S.D.N.Y.1990). We reach a different result from those decisions. As discussed below, we construe the statute to proscribe possession, within 1,000 feet of a school, of a quantity sufficient to indicate intent to distribute (felony possession). This construction is supported by legislative history not cited in these district court opinions and by the congressional purpose to create a "drug-free zone" around our nation's schools.

As noted, the statute applies to anyone "who violates § 841(a)(1) or § 856 ... by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within 1,000 feet of" a school. As also noted, § 841(a)(1) makes it unlawful "[t]o manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...."

When first enacted in 1984, the schoolyard statute provided an enhanced penalty for *distributing* drugs within 1,000 feet of a school. In 1986, Congress expanded the scope of § 845a(a) to insert "or manufacturing" after "distributing" where it appeared in the statute and by expanding the types of educational institutions [included].... 132 Cong.Rec. H11219–02 at § 1104 (1986). In 1988 Congress amended the section once again to insert ", possessing with intent to distribute," after "distributing." 134 Cong.Rec. S15785–01 at § 2254 (1988).

*Roberts,* 735 F.Supp. at 538 (emphasis in original) (footnote omitted). "In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990). In prior cases, this court has endorsed a presumption that a person who possesses a large quantity of drugs intends to distribute them. *See United States v. Hernandez–Beltran,* 867 F.2d 224, 226 (5th Cir.) ("The intent to distribute may be inferred from the possession of a large quantity of the drug."), *cert. denied,* 490 U.S. 1094, 109 S.Ct. 2439, 104 L.Ed.2d 995 (1989); *United States v. Mendoza,* 722 F.2d 96, 103 (5th Cir.1983) ("possession of a quantity of narcotics so large that it could not be used by the possessor alone justifies the conclusion that possession was for distribution"). This category of possession is made a felony by § 841, which, as noted, is referenced in the schoolyard statute; it is distinguishable from misdemeanor possession, in which a person possesses a quantity small enough to suggest that the drugs are for his or her personal use. *See* 21 U.S.C. § 844.

grams of cocaine, a Schedule II narcotic drug controlled substance as charged.

And second, that the defendant possessed the substance within one thousand feet of the real property comprising a public secondary school with the intent to distribute.

The district court overruled Wake's objection to the interpretation of the statute contained in the jury charge.

Accordingly, the clause in issue, "possessing with intent to distribute", equates with felony possession. Therefore, by substituting "felony possession" for "possessing with intent to distribute", the statute would proscribe "distributing, [felony possession], or manufacturing within one thousand feet of ... a ... school...." We view the statute as clear in proscribing the possession, within the school zone, of a felony quantity of a controlled substance— that is, an amount that evidences an intent to distribute the drugs somewhere. Congress's earlier inclusion of the phrase "or manufacturing" provides additional support for our reading of the statute. As discussed above, when the statute was first enacted, it provided an enhanced penalty only for distributing drugs within 1,000 feet of a school; but, in 1986, when the statute was amended by inserting "or manufacturing" after "distributing", this reflected that the statute was directed at the mere presence of drugs near schools.

We recognize that "[b]ecause construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." *Crandon,* 110 S.Ct. at 1002–03. In reaching our reading of the statute, it is not necessary to look to its legislative history. This notwithstanding, our reading is entirely consistent with that history. Senator Hawkins introduced the 1984 version of the statute, which proscribed only distribution. *See* 130 Cong.Rec. S559 (daily ed. Jan. 31, 1984) (statement of Senator Hawkins). She stated that the legislation was based on a premise that "threatening pushers who approach our children near schools with stiff penalties will help reduce drug use in schools." *Id.* Although she characterized the bill as a reaction to drug dealers' *distribution* activities toward children, she also articulated a purpose to "send a signal to drug dealers that we will not tolerate their *presence* near our schools." *Id.* (emphasis supplied).

Legislative history accompanying the 1986 amendments to the schoolyard statute (prescribing enhanced penalties for *manufacturing* within 1,000 feet of a school) indicates Congress' concern to eradicate drugs, and especially crack cocaine, around schools. Senator Chiles, who jointly introduced the legislation before the Senate with Senator Biden, stated:

Penalties also increase when crack cocaine is found within 1,000 feet of a school. Double penalties are imposed when the crack houses are within 1,000 feet of a school. The bills also expand existing law so that increased penalties apply for distributing or manufacturing any drugs within 1,000 feet of a school.

132 Cong.Rec. S10426 (daily ed. August 6, 1986) (statement of Senator Chiles). Senator Chiles' comments leave no doubt that the bills' proponents were concerned about the mere *presence* of large quantities of drugs around schools. His remarks also indicate an effort on the part of Congress to, among other things, cure the evil of drug dealers' setting up shop in the zone surrounding schools.

This desire to rid the area around schools of persons possessing large quantities of drugs, as discussed *infra,* formed the impetus to the 1988 amendments to the schoolyard statute. A section-by-section analysis of the amendment and other legislation was submitted to the Senate by the Judiciary Committee. It supports—indeed, mandates—our interpretation of the statute. Senator Biden explained the purpose for the sectional analysis:

As chairman of the Judiciary Committee, I, along with Senator Thurmond ... took the lead in drafting the criminal law provisions that are contained in the drug bill. I have drafted a section-by-section analysis of those provisions, and believe it will be helpful to those who wish to know the intent of the drafters of this legislation.

134 Cong.Rec. S17360 (daily ed. November 10, 1988) (statement of Senator Biden). The analysis for the amendment to the schoolyard statute states:

Section 6457. Possession With Intent to Distribute Within 1,000 Feet of a Schoolyard—

Section 845a of title 21 currently makes it a crime to distribute or to manufacture controlled substances within 1,000 feet of a school. This section adds "possession with intent to distribute" to [the] list of offenses covered by this statute so that the enhanced penalties would apply to someone apprehended near a school with a quantity of drugs sufficient to indicate an intention to distribute.

Id. at S17365. See also 134 Cong.Rec. S14067, S14071 (daily ed. October 3, 1988) (statement of Senator Nunn) (same).

The Judiciary Committee analysis makes clear that Congress' focus was on the quantity of drugs a defendant possesses within 1,000 feet of a school, not the location of the subsequent distribution. Otherwise, the above-quoted statement in the legislative history (sectional analysis) that enhanced penalties apply to "someone apprehended near a school with a quantity of drugs sufficient to indicate an intention to distribute" would be followed by: "within 1,000 feet of the school", or "to schoolchildren", or "in the vicinity of the school". Instead, Congress chose to recognize the obvious dangers inherent in possessing large quantities of drugs in the vicinity of a school, whether or not schoolchildren, or someone else within the 1,000–foot zone, are the intended objects of the distribution.

Previous decisions construing the schoolyard statute have upheld it against challenges that the particular conduct subjected to enhanced penalties was not of the type Congress attempted to remedy in enacting the statute. In United States v. Falu, 776 F.2d 46 (2d Cir.1985), for example, the Second Circuit rejected "a requirement that the dealer know that a sale is geographically within the prohibited area". Id. at 50. The court referred to an "unambiguous legislative design" in which Congress intended to "create a drug-free zone around schools...." Id.

In United States v. Jones, 779 F.2d 121 (2d Cir.1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1236, 89 L.Ed.2d 344 (1986), the Second Circuit likewise rejected an argument that the penalty enhancement should not apply because the drug sale involved

occurred in a place where schoolchildren were not present or likely to be. The court responded that "since the sale occurred within 1,000 feet of a school, it increased the risk that drugs would become accessible to school children and thereby subjected appellant to the additional penalties Congress prescribed...." Id. at 123.

The Second Circuit in United States v. Agilar, 779 F.2d 123 (2d Cir.1985), cert. denied, 475 U.S. 1068, 106 S.Ct. 1385, 89 L.Ed.2d 609 (1986) and the D.C. Circuit in United States v. Holland, 810 F.2d 1215 (D.C.Cir.), cert. denied, 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987) defended the schoolyard statute against challenges that it violated the substantive component of the due process clause. These courts rejected the argument that enhancing the penalties for transactions within 1,000 feet of a school is unconstitutional because these acts do not involve a greater degree of culpability or endanger children any more than the same transactions that occur elsewhere. The Agilar court responded to the due process challenge by stating that "Congress wanted to lessen the risk that drugs would be readily available to school children. It is surely rational to achieve that goal by increasing penalties for those who sell drugs near schools." 779 F.2d at 125.

Although none of these decisions construing the schoolyard statute has addressed the precise issue we face, they demonstrate a view of the congressional scheme for that statute that is wholly consistent with the approach we take today. We emphasize that our reading of the statute mandates that approach. The existing schoolyard statute jurisprudence demonstrates that our reading accords with the view other courts have taken of Congress' goal in enacting the statute.

For example, our reading is consistent with a strict liability approach to the statute that recognizes Congress' intent to create a drug-free zone. Falu, 776 F.2d at 50. Our approach also recognizes that the statute must be taken for what it says and be applied even in cases where schoolchildren may not be directly in danger. See Jones,

779 F.2d at 123. Finally, the interpretation we adopt recognizes that Congress, among other things, wanted not only to deter the sale of drugs to schoolchildren but also "to *lessen the risk* that drugs would be readily available to school children." *Agilar,* 779 F.2d at 125 (emphasis added).

Wake asserts that adopting the government's reading of the statute will lead to anomalous and bizarre results. For example, a district court did not adopt our reading, because to do so "would be to mandate charging a schoolhouse count every time defendants on trains, or any other means of transportation, speed by a school on their way to a narcotics sale." *United States v. Coates,* 739 F.Supp. 146, 153 (S.D.N.Y.1990). We are obliged, however, to apply the intent of Congress, even if it may lead to anomalous results in some cases.[9] As the court stated in *Agilar,* "[t]he cases condemning irrebuttable presumptions that lack rationality ... do not require that the means chosen by Congress to deal with a problem score a notable success in every application of the statute." 779 F.2d at 125 (citations omitted). Moreover, Congress' scheme is far from being irrational. There are obvious dangers arising out of the presence of large quantities of drugs within 1,000 feet of a school, even where no distribution occurs. For example, and as noted, with its 1986 amendment, Congress chose to proscribe manufacturing illicit drugs around schools, even where no distribution to schoolchildren occurred. Likewise, there is an obvious and great danger in the mere presence of drug dealers around schools. Among other things, the existence of large quantities of prohibited substances in a school zone, not to mention the concomitant crimes and risk of harm associated with drug dealers, increases greatly the likelihood that schoolchildren will come in contact with them or otherwise be placed directly in harm's way.

Further, Congress chose not to include exceptions in the statute for conduct that some might argue presented no direct danger to schoolchildren. Rather, it placed the burden on drug dealers to ascertain their proximity to schools. It adopted enhanced penalties to deter persons from bringing drugs within the prohibited zone in a sufficient quantity to evidence an intent to distribute. We will not, indeed cannot, second-guess Congress' decision not to exempt certain conduct related to the evil it sought to prevent.

Finally, Wake contends that we should adopt his construction of the statute because of the principle that ambiguous statutes should be resolved in favor of lenity, citing *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980). As demonstrated, the statute is not ambiguous. But, even assuming that the phrase in issue is ambiguous, "[t]he rule of lenity is merely a canon of statutory construction; it is inapplicable, however, when, as here, a clear legislative directive to the contrary exists." *United States v. Rivera,* 884 F.2d 544, 546 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1322, 108 L.Ed.2d 497 (1990). *See also United States v. Littlefield,* 821 F.2d 1365, 1367 (9th Cir.1987) ("We must respect this congressional purpose if the statutory language will support such a construction.").

Accordingly, even assuming ambiguity, we need not resort to the rule of lenity, because we have ascertained a legislative purpose behind the schoolyard statute to create a drug-free 1,000 foot zone, including to proscribe felony possession of a quantity of drugs within that zone. "Because of our conclusion that the intent of Congress as to the nature of [the schoolyard statute] is unambiguous, we need not employ this doctrine of last resort." *United States v. Lowe,* 860 F.2d 1370, 1376–77 (7th Cir.1988) (citing *Russello v. United States,* 464 U.S. 16, 29, 104 S.Ct. 296, 303–04, 78 L.Ed.2d 17 (1983)), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989). *See also United States v. Hescorp, Heavy Equip. Sales Corp.,* 801 F.2d 70, 77

9. Not before us is whether a court might adopt an "implied exception" to § 845a for a case where, for example, the possessing defendant merely speeds underneath a school in a subway train. We emphasize that the case before us is the paradigm of the conduct Congress sought to deter through the schoolyard statute penalty enhancements.

(2d Cir.) ("[The rule of lenity] is a doctrine of last resort, to be used only after the traditional means of interpreting authoritative texts have failed to dispel any ambiguities."), *cert. denied,* 479 U.S. 1018, 107 S.Ct. 672, 93 L.Ed.2d 723 (1986).

In addition, we find that the concerns underlying the rule of lenity are not implicated here. As stated in *United States v. Palmer,* 864 F.2d 524 (7th Cir.1988), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1029 (1989), "[t]he rule of lenity reduces the likelihood that innocuous conduct will be penalized and reduces the incentive that vague criminal laws give to be ultracautious or to abstain from lawful activities that might be confused with the subjects of the statute." *Id.* at 528. In the case of a penalty enhancement, there is little danger that this concern will be implicated, because the enhancement only comes into play if the accused is already engaged in criminal activity; *i.e.,* is violating a substantive statute.

In sum, the district court's instruction accords with our reading of the statute. We find no error.[10]

### D.

Wake objects to admission of three government exhibits on the grounds that they were not authenticated and that they contained hearsay. Government exhibit 8 consisted of items taken from Wake's wallet at the time of his arrest; it included a sheet with names, code numbers, and telephone numbers. Government exhibit 35 was a series of tally sheets seized from Wake's office; it contained code numbers, numbers representing quantities of drugs, and amounts of money. And, government exhibit 15A, notebook pages, with writing, seized from Wake's automobile, contained such statements as "Have guns out of house", "throw out calendar sheets", "What if Mitch or Doug turns me in", and "can I be indicted".

At trial, Wake's counsel objected to each exhibit as inadmissible due to lack of authentication. He did not raise hearsay objections to exhibits 8 or 35, although, as discussed *infra,* he did unsuccessfully request a limiting instruction that exhibit 15A was "not offered for the truth of the matter stated." We do not consider the belated hearsay objections to exhibits 8 and 35, raised for the first time on appeal. "In this circuit, 'unobjected-to hearsay may be considered by the trier of fact for such probative value as it may have.'" *Permian Petroleum Co. v. Petroleos Mexicanos,* 934 F.2d 635, 647 (5th Cir.1991) (quoting *Flores v. Estelle,* 513 F.2d 764, 766 (5th Cir.), *cert. denied,* 423 U.S. 989, 96 S.Ct. 401, 46 L.Ed.2d 308 (1975)). We review for abuse of discretion the other rulings admitting these exhibits. *United States v. Eakes,* 783 F.2d 499, 506–07 (5th Cir.), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986); *see* Fed.R.Evid. 103.

Fed.R.Evid. 901(a) provides:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

The government used Agent Hildreth's testimony to authenticate the three sets of writings. Hildreth testified as to the circumstances under which each writing was seized from the property or physical possession of appellant.

"Use of circumstantial evidence alone to authenticate a document does not constitute error.... Fed.R.Evid. 901(a) requires only some competent evidence in the record to support authentication." *United States v. Elkins,* 885 F.2d 775, 785 (11th Cir.1989) (citation omitted), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). Further, it was not impermissible to use the contents of the documents to establish the identity of the declarant. *United States v. Luschen,* 614 F.2d 1164, 1174 (8th Cir.), *cert. denied,* 446 U.S. 939,

---

**10.** As noted, the penalty enhancement issue was submitted to the jury. Whether this was necessary is not in issue.

100 S.Ct. 2161, 64 L.Ed.2d 793 (1980). Likewise, "the fact that no handwriting analysis was done is not a bar to ... admission." *Id.; see United States v. Calbas,* 821 F.2d 887, 893 n. 4 (2d Cir.1987), *cert. denied,* 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988). Once a preliminary showing of authenticity was made, it was, of course, for the jury to determine what weight it would give the evidence.[11] We find no error, much less the requisite abuse of discretion, in the district court's ruling that the three exhibits were properly authenticated. Hildreth's testimony was adequate to "support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).

As for exhibit 15A being inadmissible hearsay, and as noted, Wake requested, but the district court denied, only a limiting instruction that the statements contained in the exhibit were not offered for their truth. Even if this request was based upon the opinion that the exhibit was inadmissible hearsay, Wake did not object to the exhibit on that basis. Pursuant to Fed.R.Evid. 103(a)(1), Wake was required to "stat[e] the specific ground of objection, if the specific ground was not apparent from the context...." Failing an objection being made, we review only for plain error. Fed. R.Evid. 103(d). Fed.R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.*" (Emphasis added.) In fact, the exhibit may not have been Rule 801(c) "hearsay". *See* Rule 801(d)(2) (admission by party-opponent). But, even if it was, there are, needless to say, numerous exceptions to hearsay not being admissible. *E.g.,* Fed.R.Evid. 802. As noted, Wake failed to make a sufficient objection to allow this issue to be developed at trial. The testimony reveals that the exhibit was offered for the truth of its contents; however, it does not appear

to have been admitted in error. In any event, if there was error, it was harmless. *See* Fed.R.Evid. 103(a); Fed.R.Crim.P. 52(a).

### E.

Wake's remaining two bases for error merit only brief discussion. First, he contends that the government violated its agreement to relief sought by Wake's motion in limine and that his conviction should therefore be reversed. The agreed motion requested that the court instruct any United States witness "to not mention or allude in any manner to any prurient material seized from [Wake]." During trial, Wake's counsel asked Officer Staha: "Was Bubba Cates there?" Staha responded: "We called in some vice officers to pick up some pornographic material we thought contained child pornography. He was a supervisor." Wake did not object. In fact, Wake's counsel instead stated: "Okay. Since you brought this up, there was no child pornography in that house, was there?" The government objected; in response, Wake's counsel stated that the witness had "brought up this extraneously before I could object to the testimony [barred by the agreed motion]." Nor did Wake seek post-trial relief on this issue. Even if the comment, elicited in response to a question by Wake's counsel, was prejudicial, it falls far short of being plain error.

Second, Wake maintains that the district court erred in not granting a new trial because of newly-discovered evidence. The evidence that emerged after trial consisted of information that one of the officers present at Wake's arrest was indicted for currency reporting violations, money laundering, and racketeering.

In *United States v. Alvarado,* 898 F.2d 987, 994 (5th Cir.1990), we stated that

---

11. *See, e.g., United States v. Whittington,* 783 F.2d 1210, 1215 (5th Cir.) ("A decision that a document is authentic and, therefore, admissible does not determine whether the evidence will be credited by the trier of fact."), *cert. denied,* 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986); *United States v. Serna,* 799 F.2d 842,

850 (2d Cir.1986) ("Here, the testimony ... made out a prima facie case connecting the exhibit to the defendant; the evidence was thus properly submitted to the jury for a determination on its authenticity."), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987).

in order to prevail on a Motion for New Trial based on newly discovered evidence, the moving party must show that the evidence has been discovered since the trial, the facts alleged show diligence on the part of the movant, the evidence is not merely cumulative, the evidence is material, and the evidence is of such a nature that it would probably produce an acquittal.

Appellant has not shown that the information regarding Cates' indictment is material or that it would probably produce an acquittal.

### III.

For the foregoing reasons, the judgment is

AFFIRMED.