UNITED STATES of America

v.

Dalion ALSTON.

Cr. No. 93–184.

United States District Court,
District of Columbia.

Sept. 3, 1993.

**2**

---

Kevin Carwile, Asst. U.S. Atty., Washington, DC, for U.S.

John C. Floyd, III, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

ALDON J. ANDERSON, Senior District Judge (Visiting).

On April 1, 1993, defendant, Dalion Alston ("Alston"), driving a 1991 Acura Legend (hereafter the "Acura"), was stopped by the police on the Whitney Young Bridge in the District of Columbia. The Acura was on the look out sheet, or hot sheet, for stolen vehicles. The telex on the Acura, which placed the car on the hot sheet, informed police that the car would be driven by Alston who, due to prior criminal behavior, might be armed.

The telex stated, however, that Alston was not to be arrested unless, in fact, inspection of the vehicle determined its stolen status.

After stopping the Acura, Alston was asked by an Officer Wen Ai to exit the vehicle. Alston did so and was taken by the police to the rear of the vehicle, near the trunk, where he was questioned. While Alston was being questioned, a police detective by the name of Brian Henry noted that the glove box of the Acura was open and that he could see what appeared to be part of a plastic baggie sticking out of a hidden area of the box. Opening the passenger door, the officer pulled out the baggie, and determined that it was filled with cocaine. Further inspection of the glove box area of the vehicle found additional bags of drugs and three unregistered handguns. Alston was charged with various drug and gun crimes, as well as unauthorized use of vehicle.

Alston filed a number of motions, including motions to suppress. The court took evidence on the motions during the week of August 30, 1993. On September 3, 1993, after oral argument, the court orally rendered its rulings on the motions. This memorandum order sets forth those rulings in a written format.

I. Motion to Suppress Tangible Evidence:

Evidence has been presented by defendant challenging the validity of the government claim that the Acura being driven by Alston on April 1, 1993, was stolen. In that regard, Alston argued that the police did not have probable cause to stop him on April 1, 1993.

 The police are entitled to stop an individual if they have a reasonable suspicion of criminal wrongdoing. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Further, the police may arrest an individual, and may seize property, if they have probable cause of criminal wrongdoing.

 The government presented ample evidence that the officers who stopped Alston had probable cause that the vehicle was stolen. Reliable informants had informed Detective Daniel Straub of the auto theft unit of the police that there existed problems with title documents for vehicles and Alston. For

example, a title was being sought for Alston for a Lexus which was not owned by Alston. Further, the Vehicle Identification Number ("VIN") number on an Acura, reported on title documents as being owned by Alston, belonged to another vehicle. When the Acura could not be located by Detective Straub, a look out was issued for the car.

The problem with the government's case is that Terry-like stops and warrantless arrests and seizures are premised on the concept that insufficient time exists to obtain a warrant from the proper judicial officer. Here, the government had sufficient information to obtain a warrant more than eighteen hours before the Alston stop. Detective Straub acknowledged that on May 31, 1993, he had all the basic information necessary to obtain a warrant.

The court does not want to compel police to go to a magistrate as soon as they have probable cause to arrest or seize property. The police can decide when to show their hand to a magistrate. Nonetheless, the police cannot, *without risk*, sit on probable cause evidence and then proceed to arrest an individual or, as in this case, seize property without first going to a magistrate.

If the police believe they have probable cause, they should go to a magistrate or other proper judicial authority. If they do, the system and police are protected because even if no probable cause is ultimately found to have existed, as long as an independent magistrate issues a warrant, the police may rely in good faith on that warrant, and evidence will not be suppressed.

Unfortunately, in this case the police did not obtain a warrant, and consequently, the court had to take four days of evidence and testimony to determine, after the fact, if probable cause existed at the time of the stop. *The law prefers warrants.*

At the same time, a warrant is not always required. See Kamisar, Y., LaFave, W., Israel, J., *Modern Criminal Procedure* (4th Ed.1974) at 228–31. In that regard, the government presented Section 23–581 of the D.C.Code in response to the court's request that the parties brief the warrant issue. That code provision provides that a law en-

forcement officer may arrest, without a warrant having been previously issued, where "he has probable cause to believe [the suspect] has committed or is committing a felony." This statute reflects the common law. See *United States v. Hamilton*, 390 A.2d 449 (D.C.App.1978). Thus, where the police have probable cause that a felony has been committed, they may arrest individuals and may seize property. Unlike the warrant situation, however, no good faith exception exists if it is determined subsequently that no probable cause existed.

Fortunately for the government, a good faith exception is not needed. This is because, the court finds, based on the evidence presented, that the police had probable cause to stop the Acura. (The knowledge of Detective Straub is presumptively known to the other officers who were involved in stopping the Acura. See, e.g., *Illinois v. Andreas*, 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 3324 n. 5, 77 L.Ed.2d 1003.) The fact that evidence was presented at the hearing that the Acura may not have been stolen does not destroy the probable cause at the time of the stop. The evidence simply weakened the stolen vehicle claim of the indictment. The government has now dismissed the stolen vehicle claim.

Further, even if probable cause did not exist, which it did, this court finds sufficient facts existed to justify the police in having a reasonable suspicion that the Acura was stolen. That suspicion was adequate to justify the officers in stopping the Acura to determine if, in fact, it was stolen. See *Terry v. Ohio, supra*, and its progeny.

The next issue to be addressed is whether, following the stop, the police exceeded their authority in searching for, and finding the drugs and guns which form the basis of the remaining counts of the indictment.

When the officers stopped the Acura on the Whitney Young Bridge, having followed it for a space, based upon the hot sheet, the officers approached the vehicle with weapons drawn. This was appropriate given the information available to the officers on the scene. See *United States v. White*, 648 F.2d 29, 35–37 (D.C.1981). It was also

appropriate for the officers to ask Alston to get out of the vehicle for questioning. *Id.*

 Alston complied with the request to get out of the Acura, and was taken toward the back of the Acura for questioning. Because Officer Ai testified that he did not believe Alston was free to go, it is this court's view that Alston was under arrest. Consequently, the subsequent search of the vehicle cannot be justified under a mere reasonable suspicion standard. Even if the reasonable suspicion standard was applicable, the search conducted by Detective Henry was not justified under that standard. This is because searches incident to "reasonable suspicion" are limited to the area within the immediate reach of stopped individuals. Detective Henry's search of the Acura glove box was beyond the reach of Alston at the time of the search. Alston, at the time, was out of the vehicle and was with officers toward the trunk area of the Acura.

Another problem with Officer Henry's initial search of the Acura glove box was that it was not reasonably related to the reason for the stop of the vehicle, i.e., to establish the ownership of the vehicle. Officer Ai had already obtained the registration documents from Alston. If Alston was not to be arrested, and that is what the original telex hot sheet stated, and the only basis of the stop was merely to seize an alleged stolen vehicle, the police should have restricted its initial search to determining the stolen status of the vehicle. In short, after confirming that no weapons were within the reach of the suspect, the police should have either waited for Detective Straub to come and confirm the stolen status of the vehicle, or should have checked that status themselves by comparing the VIN numbers at various locations on the Acura.

 This does not mean the evidence obtained must be suppressed. The courts have recognized that where evidence would have been inevitably discovered by the police, regardless of police error, then the evidence will not be suppressed. See e.g., *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Thus, where, as here, the police had probable cause to seize the vehicle, and in normal course the drugs and guns would have been discovered through a required inventory search, then the guns and drugs need not be suppressed even though the initial discovery of the guns and drugs may have been tainted. See *U.S. v. Cooper,* 949 F.2d 737 (5th Cir.1991).

In this case, the court finds that probable cause existed to seize the Acura. After the car was seized, the government had the obligation to undertake an inventory search of the vehicle. That search would have inevitably turned up the drugs and guns. The initial plastic sack spoken of by Detective Henry was in sufficient plain view to justify the police in looking behind the covering in the glove box. Police experience, as seen by the court in watching the police officer witnesses, would have led a reasonable officer to determine what was in the plastic sack. That determination would have found cocaine. Similarly, with the cover removed, one of the handguns was in plain view. Finally, upon the discovery of the illegal gun and/or cocaine, probable cause existed to justify a more exhaustive search of the vehicle. See *Michigan v. Thomas,* 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982).

 As an alternative basis for not suppressing the evidence is that, objectively, in spite of what was set forth on the hot sheet, the court finds that the police had probable cause to arrest Alston, at the time that he was pulled over on the bridge, for unlawful possession of a stolen vehicle, etc. As part of a search incident to arrest, the police had the right to search the passenger compartment of the car. This is because of a bright line rule established by the Supreme Court in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), to give direction to the courts and police. Thus, even if a factual question might exist as to whether the passenger compartment was under Alston's immediate control at the time of the search, under *Belton,* the police had the right to search. Again, the court finds that the search would have easily found the drugs and guns.

Based on the foregoing, the court denies the motion to suppress tangible evidence.

## II. Motion to Suppress Statements

During the beginning of Straub's investigation, he left a message for Alston to contact the police. When Alston called, he was told that they wanted to talk with him about shedding some light on efforts to recover a car which Alston had earlier reported as being stolen. Alston claims that as a result of this representation he went to the station. He testified that he would not have done so if he had known that Straub was going to use the interview as an opportunity to accuse him of criminal wrongdoing. Alston also claimed that once he got there, an officer stood in the doorway and he was not sure if could leave. For those reasons, he wants to suppress the statement taken by Straub.

The government countered that Alston is not credible, as evidenced by prior criminal acts. Also, the government noted that Alston initialed Miranda statements explaining his rights. He was given the opportunity to read the statement prior to signing, but did not take it.

Alston acknowledged that he voluntarily came to the police station, voluntarily met with the detective, and that the officers never touched him or coerced him. Based on those admissions, and the totality of the circumstances surrounding the taking of Mr. Alston's statement, the court believes the statement may be used at trial, as it was voluntarily made, and was not a product of trickery or coercion.

Although not necessary, Alston was given a Miranda warning, and Alston understood his rights and waived his rights prior to speaking to the police. Even when he began to feel uncomfortable with Straub's questions, he made no statement that he wanted to discontinue the interview, and did not take any other step that would let the officers know that he wanted to depart. He was free to depart, and his staying was voluntary.

Based on the foregoing, the motion to suppress statements is denied.

## III. Motion to Dismiss/Motion in Limine

Alston's next motion is based on the police returning the alleged stolen Acura to the original owner's insurance company, rather than preserving the car for defendant's inspection and for trial. The government explained that it got from the vehicle the basic information, VIN numbers, plates etc, necessary to show the stolen nature of the car. Further, photographs were taken. After obtaining this evidence, and determining the true owner, the police turned the car over to that owner.

The difficulty with the defendant's motion is that he failed to establish the elements required by the United States Supreme Court in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Those requirements are that defendant must show (1) government bad faith and (2) that the lost evidence is material, i.e., cannot be obtained by the defense otherwise.

Now that the government has dismissed the stolen vehicle claim, the harm to defendant by not having the Acura to inspect is substantially lessened, if not altogether taken care of. At trial, the government will not present any evidence to the jury that the car being driven by Mr. Alston was stolen. See government opposition memorandum at 18. As far as the jury will be concerned, the Acura was and is Mr. Alston's car. As for the hearing on the motions to suppress, the government preserved the essential evidence [VIN plates from dash area and fire wall etc] to show probable cause. The police powers to stop and seize is based on a Probable Cause standard, not a "beyond a reasonable doubt" standard.

Evidence presented at the hearing shows that the police did not act in bad faith in returning the Acura to its true owner. On the contrary, the government was acting in good faith in seeking to return stolen property to its rightful owner. The police preserved the evidence that had apparent relevance to the case, see footnote on p. 56 of the *Youngblood* case, and the government has cooperated with the defense, and will continue to cooperate with the defense, in determining the present location on the Acura. In that regard, during the course of the hearing,

**6**

the government tracked down the present owner of the Acura and provided information to defense council as to that owner. Even if that were not the case, and the Acura was not available to defendant for inspection, the court is convinced that with the government's dismissal of the stolen vehicle claim, the Acura itself, less VIN evidence, is not material, as that term is defined in Supreme Court decisions.

For the foregoing reasons, the motion to dismiss/motion in limine re the loss of evidence is denied.

## IV. Motion to Dismiss.

The final motion argued was Alston's Motion to Dismiss The Indictment. Specifically, defendant asked the court to dismiss Count 2 of the indictment relating to possession of a controlled substance within 1000 feet of Eastern High School, and Count 5 of the indictment relating to unauthorized use of a vehicle. Alston also asked for dismissal of the remaining counts of the indictment because the grand jury was possibly inflamed by false evidence that "defendant was riding around a school in a stolen vehicle," and because the Grand Jury make-up was not truly representative of the community.

Turning to count 2, 21 U.S.C. Section 860(a) provides for sentence enhancement for defendants possessing drugs with intent to distribute within 1000 feet of a school. At the hearing the parties disputed the distance between Eastern High School and the closest point of contact with the Acura. This is a factual dispute that could be resolved by a jury. However, that does not resolve the matter as the government presented no evidence that Alston intended to distribute drugs within 1000 feet of a school.

There is a split in authority as to the meaning of 21 U.S.C. Section 860(a), as to the government's obligation to prove an actual intent to distribute drugs within the 1000 feet of a school. The Third and Fifth Circuits have upheld convictions where defendants possessed drugs within 1000 feet of the school, even where evidence existed that the defendant intended to distribute the drugs outside that distance. See *U.S. v. Rodriguez*, 961 F.2d 1089 (3d Cir.1992); *U.S. v.*

*Wake*, 948 F.2d 1422 (5th Cir.1991). On the other hand, district courts throughout the country have stated that the prosecutor must show not only possession of the drugs within 1000 feet of a school, but that the defendant also intended to distribute within that 1000 feet. See e.g., *U.S. v. Watson*, 788 F.Supp. 22 (D.D.C.1992). This judge is sympathetic to the district courts' interpretation of the statute.

However, as noted by the Assistant U.S. Attorney at the motion hearing, the Circuit Court of Appeals for the D.C. Circuit has recently agreed with the 5th and 3rd Circuits that the government need not prove intent to distribute in the 1000 foot school zone as long as it establishes illegal possession of drugs in that school zone. See *United States v. McDonald*, 991 F.2d 866 (D.C.1993). The D.C. Circuit explained that 21 U.S.C. Section 860(a) was passed to keep the *drug industry* (manufacturing, possession, and distribution) away from schools because of "the violence often accompanying serious drug offenses." *Id.* at 869. The Circuit noted:

> [I]n our view it is why possessing drugs with an intention to distribute anywhere is treated as doubly abhorrent when the possessor is in the vicinity of a school. With intended distribution, as with actual distribution and manufacturing, comes large quantities of drugs, *and thus danger....* *[T]he existence of large quantities of prohibited substances in a school zone, not to mention concomitant crimes and risk of harm associated with drug dealers, increases greatly the likelihood that schoolchildren will come in contact with them or otherwise be placed directly in harm's way.*

*Id.* 869 (emphasis added).

This court is bound by the interpretation of the statute set forth in *McDonald.* That interpretation must be viewed, however, in light of the facts of this case and the overall purposes of the statute, that being "to keep drug violence away from the schools." The facts of this case are significantly different from the facts of *McDonald,* and the cases and hypotheticals cited therein.

In *McDonald* the defendant had a large quantity of drugs in a house across the street from a school. In this case, Alston had drugs in a vehicle which first came to the attention of police officers away from any school. Only when the officers followed the vehicle through a school zone did the officers stop the vehicle. No reasonable explanation was given as to why the officers delayed pulling over Alston when they first spotted him. It is possible that the officers were merely looking for back up before the stop. On the other hand, it is also possible the police wanted to just follow Alston until he passed through a school zone so they could get an enhanced sentence. (From prior arrests, the officers could suspect that Alston might have guns and drugs.)

Under these facts, where the police had time to stop the Acura prior to it reaching a school zone, 21 U.S.C. Section 860(a), as interpreted by the D.C. Circuit, cannot be used to enhance Alston's sentence. To do so would encourage the police to chase drug suspects through school zones, or to delay arrests of suspected drug suspects until a school zone violation has occurred. This would bring "violence" to the schools, and is contrary to the purpose of the statute. Accordingly, under the narrow facts of this case, the court is dismissing count 2 of the indictment.

If the government wants to appeal the dismissal of count 2 to the Circuit Court, they may do so. *U.S. v. McDonald* simply did not visualize the situation where the police have an opportunity to stop a suspect prior to the suspect reaching a school zone, but choose not to do so until after the suspect has traveled through that zone. Alston did not stop at the school, and may not have even gone by the school but for the police following him.

By stipulation of the parties, count 5 of the indictment is also dismissed. The government is not going to pursue the stolen vehicle claim against Alston.

As to the remaining counts, the court is not persuaded that the grand jury was improperly inflamed by the information that Alston drove by Eastern High School in a stolen vehicle. Further, Alston has presented absolutely no evidence supporting a claim that the grand jury was not representative of the community. Those counts remain against Alston, and the case may proceed to trial.