Frances ROGALA, Appellant,

v.

DISTRICT OF COLUMBIA and Ephriam Williams, Officer, Badge #4357, Appellees.

No. 98–7014.

United States Court of Appeals, District of Columbia Circuit.

Nov. 12, 1998.

---

Before: SILBERMAN, HENDERSON, and TATEL, Circuit Judges.

## ORDER

Upon consideration of the motion for summary affirmance, the opposition thereto, and the reply, it is

**ORDERED** that the motion be granted. The merits of the parties' positions are so clear as to warrant summary action. *See Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294, 297 (D.C.Cir.1987) (per curiam); *Walker v. Washington,* 627 F.2d 541, 545 (D.C.Cir.) (per curiam), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 292 (1980). We affirm the judgment for appellees on appellant Rogala's claims substantially for the reasons well-stated in the district court's "Opinion, Findings of Fact and Conclusions of Law" filed January 5, 1998, and reprinted as an appendix to this order. We note that although the district court discussed a "split" on whether police may detain a passenger during a traffic stop, this case is readily distinguishable from *Dennis v. State,* 345 Md. 649, 693 A.2d 1150 (Md.1997) (holding detention invalid). Unlike in *Dennis,*

appellant did not seek to leave the scene, and Officer Williams merely required her to remain in the car, rather than in the street or on the sidewalk, in light of his concerns about his safety, her creation of a traffic hazard, and her interference with the field sobriety test. We do not reach appellant's arguments concerning the field sobriety test administered to her companion Kinberg, as he did not appeal and appellant lacks standing to challenge the test. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'") (quoting *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)).

The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. *See* D.C.Cir. Rule 41.

## APPENDIX

Robert KINBERG and Frances ROGALA, Plaintiffs,

v.

DISTRICT OF COLUMBIA, *et al.,* Defendants.

Civil Action No. 94–2516 (PLF)

United States District Court for the District of Columbia

Jan. 5, 1998.

*OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW*

FRIEDMAN, J.

Robert Kinberg and Frances Rogala bring this action for damages against the District of Columbia and Officer Ephriam Williams, an officer of the Metropolitan Police Department ("MPD"). All of the claims arise from a traffic stop and ensuing arrest of both plaintiffs.

Robert Kinberg was pulled over by Officer Williams as he drove through Georgetown late on a November evening with Frances Rogala as his passenger. After stopping the

car, Officer Williams ordered Mr. Kinberg out of the car and directed him to undergo a field sobriety test. Ms. Rogala got out of the car to join Mr. Kinberg on the sidewalk. Plaintiffs claim that Officer Williams became aggressive and threatening and ordered Ms. Rogala back into the car. A dispute broke out between Ms. Rogala and Officer Williams, and Officer Williams ultimately arrested Ms. Rogala and Mr. Kinberg and charged them with assault. Both plaintiffs spent the night in custody and were released early the next morning. The United States Attorney's Office declined to file charges against either Mr. Kinberg or Ms. Rogala.

Ms. Rogala and Mr. Kinberg sued Officer Williams and the District of Columbia for: (1) violating their Fourth Amendment right to be free from unreasonable seizures; (2) violating Mr. Kinberg's Sixth Amendment right to counsel; (3) violating Mr. Kinberg's Fifth and Sixth Amendment rights to compulsory process and to due process of law; (4) committing assault and battery against both of them; (5) falsely arresting and imprisoning them; (6) maliciously prosecuting them; and (7) intentionally inflicting emotional distress on Ms. Rogala. Plaintiffs also claim that the District of Columbia negligently retained Officer Williams with the knowledge that he was unfit to serve as a police officer.

The case was tried before the Court without a jury over a period of five days. At trial, Mr. Kinberg and Ms. Rogala testified on their own behalf. Plaintiffs also called as witnesses Ms. Eva Kempner, Mr. Afzal Kahn, Dr. Eric Cantor, Dr. Lynn Hornyak, Mr. Brian Mooar, Mr. Gerald Fisher, an attorney representing Mr. Kinberg and Ms. Rogala in their efforts to seal their arrest records, Ms. Diane Walton, former Executive Director of the Civilian Complaint Review Board, Mr. Louis Wolff and Mr. Robert Klotz, a former Captain and former Commanding Officer of Internal Affairs for the MPD, who testified as an expert in police practices and procedures.

Officer Williams testified in his own defense. Defendants also called as a witness Mr. Jerry Wilson, a twenty-five year veteran and former Chief of the MPD, who testified as an expert in police practices and procedures.

## I. FINDINGS OF FACT

At approximately 11:00 p.m. on Monday, November 22, 1993, plaintiff Robert Kinberg was driving westbound on M Street, Northwest, in Georgetown with plaintiff Frances Rogala as his passenger. The two, both attorneys, were driving home after seeing a special showing of the movie SCHINDLER'S LIST. Officer Ephriam Williams, an officer with the Metropolitan Police Department since 1986, was stationed alone in the 3200 block of M Street, Northwest, and observed Mr. Kinberg pull up next to a blue car and stop at a red light at the intersection of 33rd and M Streets. Officer Williams testified that he heard one of the cars stopped at the light race its engine. The blue car rocked forward slightly and then stopped. Officer Williams testified that he then saw Mr. Kinberg drive through the intersection against the red light. Mr. Kinberg and Ms. Rogala both testified that Mr. Kinberg did not run the red light.

The Court finds Officer Williams' testimony credible. While Mr. Kinberg may not have intended to run the red light and may genuinely believe he did not, he may well have been drawn through the light by the movement of the car next to him.[1] The Court credits the testimony of Officer Williams that he saw Mr. Kinberg run the red light and therefore concludes that the decision to stop Mr. Kinberg's car was reasonable.

Officer Williams activated his emergency lights and stopped Mr. Kinberg's car in the 3400 block of M Street. Officer Williams testified that he pulled the car over in order to determine why the car had run the red light and to ascertain whether the driver was intoxicated. Officer Williams got out of his cruiser and walked up to the driver's side of

---

**1.** Officer Williams also testified at trial that the light for eastbound traffic turned green before the westbound light did, further supporting the idea that Mr. Kinberg mistakenly may have thought the light was green when he went through the intersection.

the car. He testified that Mr. Kinberg's eyes appeared "glossy" and that his face was "bloated." He requested Mr. Kinberg's driver's license and vehicle registration and asked Mr. Kinberg whether he had been drinking. Both Officer Williams and Mr. Kinberg testified that Mr. Kinberg handed Officer Williams his license and registration and replied that he had not had anything to drink. At that point, Officer Williams ordered Mr. Kinberg to step out of the car for a field sobriety test.

Officer Williams testified that he decided to conduct the field sobriety test based on the following facts: he had seen Mr. Kinberg run a red light; Mr. Kinberg's eyes were glossy and his face was bloated; and, in Officer Williams' experience, there were often intoxicated drivers traveling through Georgetown at that time of night. Former Chief Jerry Wilson, defendants' expert in police practices, testified that these factors would be sufficient to indicate to a police officer that a driver may be intoxicated and to justify a field sobriety test.[2] Mr. Kinberg disputes Officer Williams' characterization of his facial appearance, and Ms. Eva Kempner, who saw Mr. Kinberg and Ms. Rogala at the movie earlier in the evening, testified that Mr. Kinberg looked normal after the movie. At trial, however, Mr. Kinberg testified that he may have cried at the movie, which he said had an emotional impact on both him and Ms. Rogala, and that his eyes may have been red.

The Court finds credible Officer Williams' testimony both about his observation of Mr. Kinberg's appearance and his reasons for conducting the field sobriety test. While Mr. Kinberg's glossy eyes and bloated face may have been caused by his reaction to the movie that he had just seen, in Officer Williams' experience Mr. Kinberg's appearance was consistent with that of an intoxicated person. Combined with the other factors identified by the officer, Mr. Kinberg's appearance was a legitimate basis for Officer Williams' decision to conduct a field sobriety test.

Officer Williams testified that he called for back-up at this time and then moved Mr. Kinberg to the sidewalk near the rear of the vehicle for the field sobriety test. He said that he wanted to be in a position to keep both Mr. Kinberg and Ms. Rogala in his view for his own safety. The first test, a "finger count" test, required Mr. Kinberg to count to five on the fingers of one hand and then count back down. Mr. Kinberg began counting with his first finger and then realized that he should have started with his thumb because he was going to run out of fingers. When he realized his mistake, Mr. Kinberg stopped and asked Officer Williams to clarify the instructions. After Officer Williams repeated the instructions, Mr. Kinberg successfully performed the test. Officer Williams then had Mr. Kinberg perform an "alphabet test," which consisted of Mr. Kinberg reciting the alphabet from H to Z with his head tilted backwards.

While Mr. Kinberg was performing these tests, Ms. Rogala opened the passenger door and began to get out of the vehicle. Officer Williams ordered her to get back into the car. Officer Williams testified that it is his usual practice to instruct passengers to remain in the car during traffic stops for their safety, as well as for his own. He testified that he instructed Ms. Rogala to get back into the vehicle because she was interfering with the field sobriety test and because he perceived her attitude as belligerent. Both defendants' and plaintiffs' police experts testified that it is consistent with appropriate police procedure to control the movements of individuals during a traffic stop if the officer has a reasonable belief that a threat is posed, and former Chief Wilson testified that except in the case of a high risk stop it was good police practice to direct passengers to stay in the vehicle during a traffic stop. The Court finds that Officer Williams believed that Ms. Rogala was interfering with the field sobriety test and was posing a threat when he ordered her back into the car.

---

**2.** Plaintiff's expert, Robert Klotz, testified that a police officer must look at a combination of factors to determine whether to conduct a field sobriety test. In his view, however, if a police officer does not detect slurred speech, lack of coordination or alcohol on the driver's breath, the officer should not detain the driver to conduct a field sobriety test.

After several requests, Ms. Rogala initially complied with Officer Williams' instructions, got back into the vehicle and closed the passenger door. She then slid across to the driver's seat and exited the vehicle into the roadway on the driver's side. Officer Williams ordered Ms. Rogala to move out of the roadway and to get back into the car, and he told her that if she did not move out of the roadway he would arrest her for failing to obey his order. Officer Williams testified that he told her three times to get out of the street and that Ms. Rogala finally raised her hands over her head and said, "OK, lock me up; I want you to lock me up," and that he then advised her that she was under arrest. Officer Williams testified that he did not take her into custody at that time because he was the only officer on the scene, and he wanted to wait for backup before taking her into custody. Former Chief Wilson testified that it is a permissible practice to wait for back-up before effecting an arrest. Ms. Rogala testified that Officer Williams threatened to arrest her at this time, but she denies telling Officer Williams to lock her up.

After this verbal exchange between Officer Williams and Ms. Rogala, Ms. Rogala moved to the other side of the car, but she refused the officer's direction to get back into the car. She informed Officer Williams that she was an attorney and that she had a right to be with Mr. Kinberg and observe him perform the field sobriety tests. Mr. Kinberg testified that he told Officer Williams that Ms. Rogala was his attorney and he wanted her to observe the sobriety test. Officer Williams testified that he repeatedly instructed Ms. Rogala to get back into the car but that she refused.

Ms. Rogala eventually got back into the car on the passenger side. She testified that she did not remember how much time passed before she got into the car, but in her statement to the police, she indicated that Officer Williams had his attention focused on her for approximately ten minutes. Defendant's Exhibit 28, p. 7. Ms. Rogala sat on the passenger seat with the door open and her feet on the curb. Ms. Rogala testified that Officer Williams ordered her to get all the way into

the car and threatened to arrest her if she did not. She testified that she then got a pen and paper from her purse to write down Officer Williams' name and badge number. According to Ms. Rogala, after she asked him for his name and badge number, Officer Williams threatened to call for backup. Ms. Rogala also testified that two pedestrians who had stopped to watch the events were ordered to leave the area by Officer Williams.

The Court finds that while Officer Williams may have told Ms. Rogala that he was going to call for a back-up unit after she asked him for his identifying information, his call for back-up was reasonable. According to plaintiff's own police expert, Robert Klotz, one-officer stops can be dangerous, and it therefore often is appropriate to call for backup. The Court finds that Officer Williams' decision to do so was reasonable and was not made in retaliation for Ms. Rogala's request for identifying information. The Court also finds credible Officer Williams' testimony that he in fact called for back-up when he first stopped Mr. Kinberg's car.

Officer Williams testified that after a back-up officer arrived he again told Ms. Rogala that she was under arrest and attempted to take her into custody. He ordered her out of the car; when she twice refused to come out of the car, he reached in to pull her out. Officer Williams testified that Ms. Rogala resisted his efforts to take custody of her, that she lunged forward and made a clawing motion with her hands and scratched his hand and that she screamed for Mr. Kinberg to come to her aid. Former Chief Wilson testified that if a passenger refuses to get out of a vehicle when placed under arrest, an officer may use force to get her out of the vehicle. Ms. Rogala testified that Officer Williams did not inform her that she was under arrest, but that he did grab her and pulled her out of the car; in doing so, she testified that he bruised her arm and she struck and bruised her head on the interior of the car and suffered a black eye. She did not deny calling out to Mr. Kinberg. The Court credits Officer Williams' testimony that he told Ms. Rogala that she was under arrest and that she resisted his efforts to

take her into custody. The Court finds that Ms. Rogala resisted Officer Williams' attempts to arrest her and that Officer Williams acted reasonably in the circumstances.

Meanwhile, Mr. Kinberg, responding to Ms. Rogala's scream, approached Officer Williams from behind. Officer Williams testified that Mr. Kinberg grabbed him around the neck and shoulder; Mr. Kinberg testified that he merely touched Officer Williams on the shoulder. Officer Williams turned to face Mr. Kinberg, and the two tussled while Officer Williams attempted to handcuff Mr. Kinberg. Mr. Kinberg testified that Officer Williams threw him to the ground, while Officer Williams testified that they both fell to the ground while tussling; both agree that Mr. Kinberg ended up facedown on the ground. Mr. Kinberg testified that he suffered neck and shoulder pain for three months as a result of being "tackled" by Officer Williams, but he acknowledged that Officer Williams did not hit, kick or punch him.[3] Officer Williams testified that he arrested Mr. Kinberg for interfering while Officer Williams was trying to take Ms. Rogala into custody. Former Chief Wilson testified that a police officer is justified in arresting someone who physically interferes with an arrest by grabbing the police officer from behind.

The Court finds that Officer Williams arrested Mr. Kinberg for interfering with the arrest of Ms. Rogala and that, while Mr. Kinberg may not have intended to threaten Officer Williams, it was not unreasonable for Officer Williams to believe that in responding to Ms. Rogala's screams Mr. Kinberg was in fact acting in a threatening manner toward Officer Williams and interfering with the arrest of Ms. Rogala. Given the fast-moving chain of events, Mr. Kinberg's concern for his friend, and the conflicting perceptions of the players in this drama as to exactly what was happening and why, the Court cannot

find by a preponderance of the evidence that Officer Williams' conduct with respect to Mr. Kinberg was assaultive or abusive rather than a reasonable police response to the situation.[4]

Ms. Rogala and Mr. Kinberg were placed in Officer Rusnak's cruiser to await transport to the Second District police station. Ms. Rogala requested her purse from Mr. Kinberg's car, but Officer Williams refused to give it to her. Officer Williams testified that MPD procedures do not permit arrestees to have personal belongings, such as purses, in the transport vehicle. Ms. Rogala testified that she also asked Officer Williams if she could retrieve a silver bracelet that had fallen off her wrist. Officer Williams testified that he was not aware of any complaint by Ms. Rogala that she had lost her bracelet. When the transport vehicle arrived, Mr. Kinberg and Ms. Rogala were placed in it. Ms. Rogala testified that she overheard another officer ask Officer Williams if it was really necessary to arrest the two of them. Ms. Rogala testified that Officer Williams responded, "Why, cause they're fucking attorneys? Let them see what it is like." Mr. Kinberg testified that he never heard Officer Williams use profanity.

Mr. Kinberg and Ms. Rogala then were taken to the Second District police station, where Officer Williams read them their *Miranda* rights and processed the paperwork in connection with their arrests. Both Mr. Kinberg and Ms. Rogala were charged with simple assault and were kept in separate holding cells pursuant to Second District procedures. Mr. Kinberg and Ms. Rogala testified that the cells were filthy. Ms. Rogala testified that she was frightened and was crying and that a number of officers (but not Officer Williams) were quite solicitous and tried to calm her down. Mr. Kinberg testified that he twice complained that his handcuffs were too tight. Officer Williams loosened the cuffs on both occasions. Officer Williams testified that Ms. Rogala kept interrupting him dur-

---

**3.** Dr. Eric Cantor, a doctor of internal medicine, testified that Mr. Kinberg suffered mild rotator cuff syndrome and intermittent stiffness of neck.

**4.** Officer George Rusnak, who had arrived on the scene during the struggle, assisted in handcuffing

Mr. Kinberg. Neither the plaintiffs nor defendants called Officer Rusnak, Officer Max Arevalo (the first back-up officer to arrive) or any other police officer as witnesses to corroborate their version of the events.

ing his reading of *Miranda* rights, telling him that she knew her constitutional rights better than he did, and said that she would call the judge and get the charges dropped.

Ms. Rogala testified that she was extremely upset and that she cried much of the time that she was at the station. Ms. Rogala also testified that Officer Williams was rude and taunted her. She testified that her hearing in one ear is impaired and that while she was speaking on the telephone with a pretrial services representative, she asked Officer Williams to change her handcuff so that she could hold the telephone to her good ear, but he refused. Both Dr. Cantor and Dr. Lynn Hornyak, a clinical psychologist, testified that Ms. Rogala suffered from Post Traumatic Stress Disorder as a result of the events surrounding the traffic stop and her arrest. As was apparent both from the substance of her testimony and her demeanor while testifying, Ms. Rogala was visibly upset by her experience, and the Court credits her testimony and her doctors' testimony that she was traumatized by the events.

Officer Williams testified that processing at the Second District took longer than an hour but less than the three hour time limit imposed by MPD regulations. Mr. Kinberg testified that they were at the Second District from approximately midnight until 3:30 a.m. Mr. Kinberg and Ms. Rogala were then transported to the Central Cell Block for fingerprinting and photographing. Mr. Kinberg testified that they were finally released at 5:30 a.m. and that they took a taxicab back to Mr. Kinberg's car.

The United States Attorney decided not to file charges against Ms. Rogala and Mr. Kinberg, and they were so informed at their first court appearance on December 2, 1993. Gerald Fisher testified that Ms. Rogala and Mr. Kinberg went to considerable expense to seal their arrest records and that Ms. Rogala and Mr. Kinberg were still in the process of trying to get the records sealed. He stated that even if they succeeded in sealing the arrest records, the arrests will continue to affect their job prospects and lives.

At trial, the Court heard testimony from three other people, pursuant to Rule 404(b), Fed.R.Evid., about their experiences with Officer Williams on other occasions. Mr. Afzal Kahn testified that in October 1991, he heard fire engines on his street and, when he went outside, he saw that his friend's house was on fire. As Mr. Kahn stood on the street with his neighbors watching the firefighters, Officer Williams approached him and told him to go away. Mr. Kahn testified that he refused to leave, and Officer Williams became abusive and asked Mr. Kahn if he understood English. When Mr. Kahn started to walk away, Officer Williams forcibly arrested him for failure to obey an officer. Mr. Kahn filed a complaint with the Civilian Complaint Review Board alleging harassment and excessive force. Mr. Kahn's complaint for harassment was sustained, but his excessive force complaint was not. The Board recommended that Officer Williams receive diversity training and that a letter of prejudice be placed in his file.[5]

Officer Williams testified that he asked Mr. Kahn to move because the fire was dangerous and he was trying to keep the area clear. Officer Williams also testified that he was not sure that Mr. Kahn understood the order to move because Mr. Kahn had spoken with an accent. Mr. Louis Wolff, a journalist, testified that he witnessed the incident with Mr. Kahn and that Mr. Kahn was not impeding the firemen.

Mr. Brian Mooar, a reporter with the *Washington Post*, testified that he witnessed Officer Williams and another officer arresting a woman for drunk driving and handcuffing her to a mailbox at approximately 2:30 a.m. on December 18, 1993. The woman was crying and very distraught; the officer appeared to be laughing. Mr. Mooar testified that when he tried to photograph the inci-

---

5. A letter of prejudice is a written notice to a police officer "outlining specific unsatisfactory job performance or conduct." The letter of prejudice is considered in performance evaluations, may be used in deciding greater degrees of disciplinary action and places the police officer on notice that he or she "shall receive either an official reprimand or adverse action for any similar violation within a two year period." Plaintiffs' Exhibit 21, General Order No. 1202, *et seq.*, Disciplinary Procedures and Processes at 8.

dent, Officer Williams became abusive, grabbed Mr. Mooar's camera, and threatened to arrest him. Mr. Mooar testified that he did not get his camera back until a sergeant arrived on the scene.[6]

Having heard the testimony of the witnesses in this case and having observed their demeanor, the Court believes that Mr. Kinberg and particularly Ms. Rogala were upset, frightened and shaken by their unaccustomed encounter with a police officer late at night in Georgetown. Because they probably believed they had not run a red light and knew they had not been drinking, they were undoubtedly also offended by the indignity of being stopped, ordered about, (in Mr. Kinberg's case) made to take a sobriety test, and ultimately arrested. No doubt that Officer Williams is an imposing, aggressive and controlling individual, as evidenced by his conduct here and in the case of Mr. Kahn. Furthermore, while the Court believes that other officers might have handled the situation differently, the testimony of former Chief Wilson (and to a large extent of Mr. Klotz as well) persuades the Court that the procedures followed were not unreasonable. The Court also finds that Ms. Rogala overreacted to Officer Williams' legitimate display of authority; she was aggressive and defiant of his authority and position. The situation escalated largely because of her conduct, not his, and the Court concludes that Officer Williams acted reasonably in the circumstances.

## II.  CONCLUSIONS OF LAW

Ms. Rogala and Mr. Kinberg have asserted claims under 42 U.S.C. § 1983 against both Officer Williams and the District of Columbia for violations of their Fourth, Fifth and Sixth Amendment rights.[7] They have asserted claims for false arrest, assault and battery,

and malicious prosecution against both Officer Williams and the District of Columbia. Ms. Rogala has asserted a claim for intentional infliction of emotional distress against both Officer Williams and the District of Columbia. Finally, Mr. Kinberg and Ms. Rogala have asserted a claim against the District of Columbia for negligent retention of Officer Williams as a police officer. Each of these claims is considered separately below.

### A.  Section 1983 Claims Against Officer Williams

#### 1.  Fourth Amendment

A citizen who alleges that he or she has been subjected to an unreasonable search or seizure, or excessive force in the course of an arrest or seizure, in violation of the Fourth Amendment may seek redress under Section 1983. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In determining whether a seizure is reasonable, "[t]he touchstone of [the court's] analysis . . . [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108–109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). This analysis requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation omitted). The test is an objective one, made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

Plaintiffs allege that Officer Williams' conduct, from the initial traffic stop through their arrests, violated their Fourth Amend-

---

**6.** The incident described by Mr. Mooar was the subject of litigation against the District of Columbia and Officer Williams. *See DeGraff v. District of Columbia*, 120 F.3d 298 (D.C.Cir.1997).

**7.** Section 1983 provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.

ment rights to be free of unreasonable seizures. Plaintiffs first allege that Officer Williams violated their Fourth Amendment rights by stopping Mr. Kinberg's vehicle without probable cause to believe that Mr. Kinberg had violated the law. Because the Court credits Officer Williams' testimony that he observed Mr. Kinberg run a red light, the initial stop of Mr. Kinberg's car was reasonable, supported by probable cause, and there therefore was no Fourth Amendment violation. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 1777, 135 L.Ed.2d 89 (1996) (when officer has probable cause to believe a motorist has violated traffic laws, a traffic stop is presumptively reasonable).

Plaintiffs next claim that Officer Williams lacked the requisite level of suspicion to conduct a field sobriety test. The Supreme Court has not directly addressed the level of suspicion required for the detention of a lawfully stopped driver for a field sobriety test. *See Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (although police may set up roadblocks without any individual suspicion, detention of particular motorist for more extensive sobriety testing "may require satisfaction of an individualized suspicion standard") (in *dictum*). Because of the significant public interest in preventing a motorist whom an officer reasonably believes may be intoxicated from continuing to drive, and because further detention for a field sobriety test is a minimal intrusion on an already legally stopped individual's privacy, however, many state 'courts have held that an officer may detain a motorist for such testing so long as there is reasonable suspicion that the driver may be intoxicated. *See, e.g., State v. Lamme,* 19 Conn.App. 594, 563 A.2d 1372 (Conn.App.1989), *affirmed,* 216 Conn. 172, 579 A.2d 484 (Conn.1990) (administration of field sobriety tests requires only *Terry* reasonable suspicion); *State v. Little,* 468 A.2d 615, 617–18 (Me.1983) (same); *State v. Superior Court,* 149 Ariz. 269, 718 P.2d 171, 175–76 (Ariz.1986) (en banc) (same); *State v. Wyatt,* 67 Haw. 293, 687 P.2d 544, 552–53 (Haw.1984) (same); *see generally* 4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 10.8(d) at 707–708 & n.176 (3d ed.1996); *but see People v. Carlson,* 677 P.2d 310 (Colo.1984) (field sobriety test may be conducted only where officer has preexisting probable cause to arrest for driving under influence).

No court in the District of Columbia has yet considered the degree of suspicion required to conduct a field sobriety test, but this Court is persuaded by the reasoning of the courts in those states that have concluded that a field sobriety test is such a minimal intrusion on the driver of the car that only reasonable suspicion is required to conduct such a test. At the time of the stop of Mr. Kinberg's car for running a red light, Officer Williams observed that Mr. Kinberg's eyes were glossy and that his face was bloated. These observations, when coupled with the fact that Officer Williams had just seen Mr. Kinberg drive through a red light, are sufficient to justify a field sobriety test under the reasonable suspicion standard.

Plaintiffs also allege that Officer Williams unconstitutionally seized Ms. Rogala when he ordered her to get back into the vehicle. A person has been "seized" under the Fourth Amendment if her freedom of movement is restrained by use of force or show of authority such that a reasonable person in the circumstances would believe that she is not free to walk away. *United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The Court concludes that Officer Williams asserted such control over Ms. Rogala when he ordered her to get back into the car. The question is whether the exercise of that control violated Ms. Rogala's Fourth Amendment rights.

The Supreme Court recently clarified that passengers in cars that are legitimately stopped may be subject to some control by the police officer conducting the stop. *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). In *Wilson,* the Court held that a police officer conducting a valid traffic stop may constitutionally order a passenger *out* of the car, even where the police officer has no suspicion that the passenger has committed a crime. *Id.* 117 S.Ct. at 886. The court in *Wilson* expressly reserved the question of whether an officer

may forcibly detain a passenger for the duration of the stop. *See id.* at 886, n. 3. The courts are split on this issue. *Compare United States v. Moorefield,* 111 F.3d 10 (3d Cir.1997) (police officer lawfully ordered passenger to remain in car with hands in air) *with Dennis v. State,* 345 Md. 649, 693 A.2d 1150 (Md.1997) (where state articulated no reason why it was necessary for officer's safety to detain passenger rather than letting him walk away, detention unconstitutional), *cert. denied,* —— U.S. ——, 118 S.Ct. 329, 139 L.Ed.2d 255.

In this case, Officer Williams ordered Ms. Rogala back into the car because she was blocking traffic and interfering with the field sobriety test that he was conducting of Mr. Kinberg. Both former Chief Wilson and Mr. Klotz testified that it is reasonable and appropriate police procedure to take steps to control the movements of individuals during a traffic stop if the officer reasonably believes that a threat is posed, and former Chief Wilson specifically testified that it is good police practice to direct passengers to stay *in* the vehicle during a traffic stop. This Court concludes that in the circumstances presented, it follows from *Maryland v. Wilson* that a police officer has the power to reasonably control the situation by requiring a passenger to remain *in* a vehicle during a traffic stop, particularly where, as here, the officer is alone and feels threatened. *See United States v. Moorefield,* 111 F.3d at 12–13; *United States v. White,* 648 F.2d 29, 37 (D.C.Cir.) (in the context of traffic stops, "[c]ourts have routinely allowed officers to insist on reasonable changes of location when carrying out *Terry* stops. The exigencies of the circumstances determine what moves are reasonable in a given situation . . .") (internal citations omitted), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981); *see also United States v. Mangum,* 100 F.3d 164,

169 (D.C.Cir.1996). The Court concludes that it was reasonable for Officer Williams to order Ms. Rogala to stay in the car in order to maintain control of the situation and that he therefore did not violate her Fourth Amendment rights.

Plaintiffs next assert that Officer Williams violated their Fourth Amendment rights because he lacked probable cause to arrest them. A police officer in the field can make a warrantless arrest if he has knowledge of "facts and circumstances sufficient to warrant a prudent [officer] in believing that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *see also* D.C.Code § 23–581(a)(1)(B) (a law enforcement officer may arrest without a warrant "a person who he has probable cause to believe has committed or is committing an offense in his presence").

Officer Williams arrested Ms. Rogala for disobeying his order to return to the car after she had interfered with the field sobriety test that he was conducting. Ms. Rogala's interference and refusal to obey Officer Williams' orders provided grounds for her warrantless arrest. *See* D.C.Code § 22–505(a).[8] While D.C.Code § 22–505(a) has been narrowly construed to apply to physical conduct rather than speech, *In the Matter of E.D.P., Jr.,* 573 A.2d 1307, 1309 (D.C.1990), Officer Williams was responding to Ms. Rogala's physical conduct in refusing to return to the car, which prevented him from focusing his attention on conducting Mr. Kinberg's field sobriety test. Plaintiffs' police expert, Mr. Klotz, testified that citizens are required to obey lawful orders of the police, and on cross examination, he testified that if a passenger constitutes a threat or interferes with an officer's routine performance of his duties, the officer may arrest the passenger. Defendant's expert, former Chief Wilson, testified that if a passenger seeks to interfere with a

---

8. D.C.Code § 22–505(a) provides, in pertinent part,

    (a) Whoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates or interferes with any officer or member of any police force operating in the District of Columbia ... while engaged in or on account of the performance of his or her

official duties, shall be fined not more than $5,000 or imprisoned not more than 5 years, or both. It is neither justifiable nor excusable cause for a person to use force to resist an arrest when such arrest is made by an individual he or she has reason to believe is a law enforcement officer, whether or not such arrest is lawful.

field sobriety test, the officer may order her to stop interfering; he also testified that passengers are ordinarily told to remain in the vehicle during traffic stops. As discussed above, the Court finds that Officer Williams had reasonable grounds to order Ms. Rogala to remain in the car to prevent her from interfering with the field sobriety test. Ms. Rogala disobeyed that order and remained outside the car for ten minutes. Her refusal to obey Officer Williams' order interfered with Officer Williams' performance of his official duties and constituted an arrestable offense committed in his presence.

Officer Williams arrested Mr. Kinberg for interfering with his arrest of Ms. Rogala. Impeding an officer performing an arrest is a criminal offense. *See* D.C.Code § 22–505(a). Mr. Kinberg's intent may have been only to calm the situation. From Officer Williams' perspective, however, Mr. Kinberg's actions constituted a threat to Officer Williams as Officer Williams tried to arrest Ms. Rogala. A reasonably prudent officer in Officer Williams' situation could well believe that Mr. Kinberg was intending to interfere with the arrest of Ms. Rogala. Officer Williams therefore had probable cause to arrest Mr. Kinberg.

Finally, plaintiffs claim that Officer Williams' actions in pulling Ms. Rogala from the car, his alleged verbal harassment and his tackling of Mr. Kinberg constitute violations of their Fourth Amendment rights. Under the "objective reasonableness" standard of the Fourth Amendment, an officer has the authority to use "some degree of physical coercion or threat thereof" during the course of an arrest, and "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Graham v. Connor,* 490 U.S. at 395–97, 109 S.Ct. 1865. The use of such coercion is to be judged "from the perspective of a reasonable officer on the scene ... [with] allowance for the fact that police officers are often forced to make split-second judgments ... about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. An officer will only be held liable if the force

used was so excessive that no reasonable officer could have believed in the lawfulness of his actions. *See Wardlaw v. Pickett,* 1 F.3d 1297, 1303 (D.C.Cir.1993), *cert. denied,* 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994). The underlying intent or motivation of the officer is not considered; the only issue is whether the officer's actions are " 'objectively reasonable' in light of the facts and circumstances" confronting him. *See DeGraff v. District of Columbia,* 120 F.3d 298, 301 (D.C.Cir.1997). In view of the factual and credibility findings made by the Court, the Court necessarily concludes that the force used by Officer Williams was not excessive and that his conduct was objectively reasonable.

In taking custody of Ms. Rogala, Officer Williams reached into the car and pulled her out by the arm. Defendants' police expert testified that it is permissible police procedure to reach into a vehicle to remove a person who has been placed under arrest and who refuses to get out of the vehicle. The Court finds that Ms. Rogala did not exit the vehicle when Officer Williams tried to take her into custody and ordered her out of the car. The Court also finds that Ms. Rogala resisted Officer Williams' attempts to remove her from the car. There is no indication that Officer Williams used excessive force in removing Ms. Rogala from the car. *See Martin v. Malhoyt,* 830 F.2d 237 (D.C.Cir.1987) (no excessive force even where arresting officer allegedly brutally grabbed driver by waist, threw him back into the driver's seat and slammed door on his legs). The Court finds that the level of force used by Officer Williams to remove Ms. Rogala from the car was reasonable, and that there was no constitutional violation.

Officer Williams' arrest of Mr. Kinberg resulted in Mr. Kinberg being thrown to the ground, according to Mr. Kinberg, or placed on the ground or having fallen there as the result of a tussle, according to Officer Williams. Defendants' police expert testified that if an officer is grabbed from behind, the officer may have to tackle the person if it is necessary to bring the person under control. Officer Williams reasonably perceived Mr. Kinberg's actions as threatening and inter-

fering with his arrest of Ms. Rogala. The Court finds that Officer Williams did not use unreasonable force in responding to that threat. *See Wardlaw v. Pickett,* 1 F.3d at 1304 (no unreasonable force where U.S. Marshal punched man in jaw and chest who interfered with arrest).

The Court finds that plaintiffs have failed to establish a deprivation of their Fourth Amendment rights, and Officer Williams is entitled to judgment on this claim.

### 2. *Sixth Amendment*

Mr. Kinberg next asserts that Officer Williams' attempted control over Ms. Rogala during the field sobriety test deprived him of his right to counsel in violation of the Sixth Amendment. There is no merit to this claim.

The Sixth Amendment right to counsel attaches only upon the initiation of adversarial judicial criminal proceedings, which include the "formal charge, preliminary hearing, indictment, information, or arraignment," *Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), and "certain 'critical' pretrial proceedings ... [at which] the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (citation omitted). Mere confrontation with a police officer, or even an arrest, does not signal the initiation of such proceedings. *Id.; see Schmerber v. California,* 384 U.S. 757, 765–66, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (no Sixth Amendment right to counsel in connection with blood alcohol test). Until adversary judicial proceedings have been initiated, the mere "fortuity" that a person happens to have retained counsel does not give that person a Sixth Amendment right to consult with that counsel. *See Moran v. Burbine,* 475 U.S. 412, 430, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ("the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel ... [the right to counsel] becomes applicable only when the government's role shifts from investigation to accusation").

When Officer Williams ordered Ms. Rogala to return to the car, he was conducting a field sobriety test of Mr. Kinberg. No formal charges had been filed against Mr. Kinberg at that time, and adversary judicial proceedings had not been initiated. Without the initiation of criminal judicial proceedings, Mr. Kinberg's Sixth Amendment right to counsel had not yet attached. *Kirby v. Illinois,* 406 U.S. at 688–89, 92 S.Ct. 1877. The "fortuity" that he was stopped while riding with an attorney does not give him any additional Sixth Amendment protection. *See Moran v. Burbine,* 475 U.S. at 428–31, 106 S.Ct. 1135. Officer Williams therefore is entitled to judgment on this claim.

### 3. *Fifth and Sixth Amendments*

Plaintiffs' final constitutional claim against Officer Williams is that he violated Mr. Kinberg's Sixth Amendment right to compulsory process and his Fifth Amendment right to due process of law by excluding Ms. Rogala from witnessing the sobriety test and by ordering two bystanders to leave the area. Plaintiffs have not established a deprivation of a constitutional right, and judgment on this claim therefore is entered for Officer Williams.

Plaintiffs cite no case establishing an affirmative duty on the part of the police to allow bystanders to remain at an arrest scene so that they may become witnesses favorable to the arrestee. The duty of the police to *preserve* material and potentially exculpatory evidence does not extend to require an officer to allow witnesses to remain at potentially dangerous scenes of crime. *See Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *United States v. McKie,* 951 F.2d 399, 403 (D.C.Cir.1991). Such a duty would be inconsistent with the officer's prerogative to control the scene of an encounter for his own safety and for the safety of the public. *See United States v. White,* 648 F.2d at 37.

Even if plaintiffs could establish that Officer Williams had a duty to preserve witnesses, there is no basis for a constitutional claim unless a defense is prejudiced by the

breach of that duty. *See California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1983); *United States v. Alston,* 832 F.Supp. 1, 5–6 (D.D.C.1993). The fact that neither Mr. Kinberg nor Ms. Rogala was ever prosecuted on any charges stemming from their altercation with Officer Williams ends the analysis. In the absence of a criminal trial, there was no defense to be prejudiced by the unavailability of bystanders to testify or by the absence of Ms. Rogala's testimony. *Cf. United States v. Alston,* 832 F.Supp. at 5–6. Plaintiffs therefore have failed to establish a deprivation of their Fifth or Sixth Amendment rights.

### B. Section 1983 Claims Against The District of Columbia

Plaintiffs allege that the District of Columbia has been deliberately indifferent to the rights of its citizens by failing to maintain effective systems for evaluation of the performance of its police officers, for in-service training of its officers, and for resolution of citizen complaints. Pls.' Pretrial Brief at 17–18. They further allege that this failure to act caused the violation of their constitutional rights through the conduct of Officer Williams. *Id.*

A municipality may be sued under Section 1983 for implementing or executing a policy or custom that causes the deprivation of an individual's constitutional rights. *Monell v. Dep't of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs therefore have the burden of proving (1) that they were deprived of constitutional right(s); and (2) that the deprivation was caused by a policy or custom of the municipality. *See Atchinson v. District of Columbia,* 73 F.3d 418, 420 (D.C.Cir.1996) (municipality can only be held liable if it is "itself responsible for an unconstitutional deprivation of rights"). For suits alleging failure to train or supervise, plaintiffs must also establish that the need for more or different training or supervision was so obvious and the inadequacy so likely to result in a violation of constitutional rights that policymakers can be said to have been deliberately indifferent to the need. *See City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Dorman v. District of Columbia,* 888 F.2d 159, 165 (D.C.Cir.1989).

Plaintiffs have not established the deprivation of any constitutional right, *see* supra at Section A, and the Section 1983 claim against the District of Columbia therefore cannot be sustained.

### C. Common Law Claims Against Officer Williams And The District of Columbia

Plaintiffs assert a number of common law claims against Officer Williams and the District of Columbia. The District of Columbia stipulates that Officer Williams acted within the scope of his employment throughout the encounter with plaintiffs. Therefore, any judgment in favor of or against Officer Williams on the common law claims will also constitute a judgment in favor of or against the District of Columbia under the doctrine of *respondeat superior. See Wade v. District of Columbia,* 310 A.2d 857, 863 (D.C. 1973).[9]

---

**9.** Plaintiffs also assert a common law negligent retention claim against the District of Columbia. In order to prevail on a negligent retention claim, plaintiffs must first prove that Officer Williams was negligent and must then prove the additional element of negligent retention. *See e.g. Ang v. District of Columbia,* Civil Action No. 95–0667, Memorandum Opinion and Order at 5 (D.D.C. November 25, 1995) (Friedman, J.); *Middough v. District of Columbia,* Civil Action No. 93–0622, Order at 4 (D.C.Super. July 27, 1993) (Kramer, J.). Because the District of Columbia has already stipulated that Officer Williams was acting within the scope of his employment, however, it is liable under a theory of *respondeat superior* for any tortious actions taken by Officer Williams and it is unnecessary for plaintiffs to prove the additional negligent retention element. *See Curry v. Giant Food Co.,* 522 A.2d 1283, 1289–90 (D.C.1987) (negligent retention claim intended to be used in situations where employer disclaims the actions of its employees). The Court therefore does not need to decide whether or not the District negligently retained Officer Williams. *Cf. Burkhart v. Washington Metropolitan Area Transit Authority,* 112 F.3d 1207, 1215 (D.C.Cir.1997).

### 1. *False Arrest*

The central question in an action against a police officer for false arrest is whether the officer was justified in arresting the plaintiff. *District of Columbia v. Murphy*, 631 A.2d 34, 36 (D.C.1993); *accord Dellums v. Powell*, 566 F.2d 167, 175 (D.C.Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). An officer can demonstrate justification by showing that he had probable cause to believe a crime had been committed. *District of Columbia v. Murphy*, 631 A.2d at 36; *accord Wade v. District of Columbia*, 310 A.2d at 862. The Court already has concluded that Officer Williams had probable cause to arrest both Ms. Rogala and Mr. Kinberg. Defendants therefore are entitled to judgment on this claim.

### 2. *Assault and Battery*

Plaintiffs next allege that Officer Williams assaulted and battered them by forcefully arresting them and by treating them roughly and subjecting them to verbal abuse during their detention. In the course of making a lawful arrest, a police officer is privileged to use force so long as the "means employed are not in excess of those which [he] reasonably believes [are] necessary." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (internal quotation omitted). The officer's judgment is to be reviewed "from the perspective of a reasonable officer on the scene," with allowance for the officer's need to make quick decisions under potentially dangerous circumstances. *Id.* (quoting *Graham v. Connor*, 490 U.S. at 396–97, 109 S.Ct. 1865). This standard is similar to the excessive force standard applied in the Section 1983 context. *Id.* at 915 n. 10. Furthermore, an officer may commit what at common law would be an assault unless "the threatened use of force is clearly excessive." *Jackson v. District of Columbia*, 412 A.2d 948, 956 (D.C.1980). The Court finds that Officer Williams did not threaten Ms. Rogala or Mr. Kinberg with "clearly excessive" force. For substantially the reasons discussed supra at 54–55, the Court finds that Officer Williams did not use excessive force in arresting Ms. Rogala and Mr. Kinberg.

Plaintiffs therefore have failed to prove their assault or battery claim.

### 3. *Malicious Prosecution*

An action for malicious criminal prosecution requires proof of the institution of a criminal action, with malice and without probable cause, that ultimately terminates in the plaintiffs' favor. *Dellums v. Powell*, 566 F.2d at 191 n. 65. A criminal action is "instituted" upon the filing of an information or indictment; a mere arrest, not followed by the filing of an information or the return of an indictment, cannot give rise to liability for malicious prosecution. *Id.* at 192 (in *dictum*) (citing *Auerbach v. Freeman*, 43 App.D.C. 176 (D.C.Cir.1915) (when larceny charge was *nolle prossed*, no prosecution had been instituted)); *see also Jackson v. District of Columbia*, 710 F.Supp. 13, 14–15 (D.D.C.1989) (tort of malicious prosecution intended to remedy the "evil" of "defending against unjustified litigation," and the remedy therefore is unavailable for "mere arrest"). While Mr. Kinberg and Ms. Rogala were arrested for simple assault, no charges were ever filed against them. Because plaintiffs have failed to establish that there was any prosecution, much less a malicious one, the Court enters judgment for defendants on this claim.

### 4. *Intentional Infliction of Emotional Distress*

Ms. Rogala asserts a claim for intentional infliction of emotional distress based upon Officer Williams' treatment of her prior to, during and after her arrest. Specifically, Ms. Rogala claims that Officer Williams threatened to arrest her repeatedly, yelled and cursed at her, ignored her request to recover her purse and bracelet after she was arrested, told her that he wanted her to see what it was like to be arrested, laughed at her hearing impairment, laughed when she cried, and detained her for an unnecessarily long time at the station. She claims that Officer Williams' conduct caused her severe emotional distress.

To recover on a claim for intentional infliction of emotional distress, a plaintiff must demonstrate "extreme and outrageous conduct which intentionally or recklessly

cause[d] severe emotional distress." *Jackson v. District of Columbia*, 412 A.2d at 956–57 (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965) ("RESTATEMENT")). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* at 957 (quoting RESTATEMENT § 46 cmt. d). An action for intentional infliction of emotional distress may be maintained against an arresting officer if he made a lawful arrest but applied "a serious [quantum] of excessive force," *id.* at 955, or if he made an egregiously unlawful arrest. *See Carter v. District of Columbia*, 795 F.2d 116, 139 (D.C.Cir.1986). The ultimate question is whether the officer's actions constituted "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," or whether they were truly outrageous. *See* RESTATEMENT § 46 cmt. d.

While the Court credits Ms. Rogala's testimony and that of her doctors that she was extremely distressed by Officer Williams' actions in arresting her, the Court finds that Officer Williams' conduct did not approach the level of egregiousness necessary to sustain a claim for intentional infliction of emotional distress. The Court finds that Officer Williams told Ms. Rogala that he was going to arrest her, and he may have spoken to her with a raised voice and harsh words, but he did not yell and curse at her. The Court also finds that Officer Williams' refusal to allow Ms. Rogala to keep her purse with her is consistent with police procedure and was reasonable. The Court credits Officer Williams' testimony that he was not aware that Ms. Rogala had lost her bracelet. The Court also credits Officer Williams' testimony that Mr. Kinberg and Ms. Rogala were detained for less than three hours. Even according to Mr. Kinberg's account, Mr. Kinberg and Ms. Rogala were held at the police station for at most something less than four hours, from a little before midnight until 3:30 a.m. The Court finds that the duration of this detention does not constitute outrageous conduct. Finally, to the extent that Ms. Rogala perceived that Officer Williams took pleasure in arresting her, the alleged conduct simply does not rise to the level of truly outrageous conduct "as to go beyond all possible bounds of decency." *Jackson v. District of Columbia*, 412 A.2d at 957. Plaintiff therefore has failed to establish this claim.

### III.   CONCLUSION

The events that occurred on the evening of November 22, 1993 were most unfortunate. They had a considerable impact on the lives of Mr. Kinberg and especially Ms. Rogala. On an objective reasonableness standard, however, and in view of the credibility findings made by the Court, the Court cannot find that plaintiffs have carried their burden of proof by a preponderance of the evidence on any of their claims. The Court finds that Officer Williams' conduct violated none of the constitutional or common law rights asserted by plaintiffs and that his conduct was objectively reasonable. Judgment therefore must be entered for defendants on all claims.

An Order and Judgment consistent with this Opinion shall be issued this same day.

SO ORDERED.